SCARSDALE OIL ASSOCIATES, 1983A, BERNARD J. PITKOFF, TAX MATTERS PARTNER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Scarsdale Oil Assoc., 1983A v. Commissioner
Docket No. 13750-89
United States Tax Court
T.C. Memo 1992-190; 1992 Tax Ct. Memo LEXIS 209; 63 T.C.M. (CCH) 2602; March 31, 1992, Filed *209 Decision will be entered for respondent. Respondent determined adjustments to petitioner's partnership return for 1983 and 1984. The partnership ostensibly was formed to drill for oil and gas. Held: Petitioner lacked a profit objective and respondent properly disallowed all deductions at issue; sec. 183, I.R.C.; Golanty v. Commissioner, 72 T.C. 411 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). Charles Haydon, for petitioner. Jane B. Wilson and Maria Stabile, for respondent. HALPERN
HALPERN
MEMORANDUM FINDINGS OF FACT AND OPINION HALPERN, Judge: Respondent, in a notice of final partnership administrative adjustment (FPAA), determined adjustments to the partnership return of $ 3,296,578 and $ 11,559.58 with respect to Scarsdale Oil Associates, 1983A's 1983 and 1984 taxable years, respectively. Those amounts, in their entirety, remain in dispute. Scarsdale Oil Associates, 1983A (Scarsdale 1983A or the partnership) had its principal place of business at 696R White Plains Road, Scarsdale, New York, at the time the petition was filed in this case. Bernard J. Pitkoff (petitioner herein) was the tax matters *210 partner for Scarsdale 1983A during the taxable years at issue. For the taxable years at issue, Scarsdale 1983A filed timely returns, Form 1065, with the Internal Revenue Service. On May 1, 1989, respondent timely issued to Bernard J. Pitkoff, tax matters partner of Scarsdale 1983A, an FPAA, wherein respondent disallowed deductions for the following: 1983
1984
Intangible drilling costs
$  3,250,000
--
Printing/stationery
3,500
--
Legal accounting
42,000
$   5,000.00 Office expenses
21
56.48 Amortization
1,057
12,683.75 Gross income
--
(6,180.65)
Total
$  3,296,578
$  11,559.58
The sole issue in dispute is whether respondent properly disallowed the above deductions claimed by the partnership. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations of facts filed by the parties and attached exhibits are incorporated herein by this reference. Bernard J. Pitkoff (Pitkoff) is a certified public accountant who, for over 28 years, has managed his own public accounting firm, Bernard J. Pitkoff and Co. Pitkoff provided accounting and tax-related services to his clients. Prior to the years here at issue, Pitkoff placed *211 his clients in programs with advantageous tax consequences. He received commissions from promoters for so doing. In 1982, Pitkoff was contacted by First Eastern Equities Corp. (First Eastern) about offering his clients an opportunity to invest in their gas and oil drilling deals. First Eastern is a registered broker-dealer and a member of the National Association of Securities Dealers, Inc. First Eastern's principals were Donald Palombo (Palombo), Donald Platz (Platz), and Edward E. Kozelka (Kozelka). First Eastern had been involved with the oil and gas business since 1981. Before discussing Pitkoff's oil and gas drilling activities in 1983, we will review briefly his 1982 activities. Formation of Scarsdale 1982
In 1982, after initial discussions with First Eastern, Pitkoff visited the proposed drill site in the Austin Chalk area of Texas. Based primarily upon his conversations with, and information provided by, First Eastern's agents and consultants, Pitkoff created his own oil and gas drilling limited partnership -- Scarsdale Oil Associates 1982 (Scarsdale 1982) -- and served as general partner thereof. That was the first time Pitkoff ever served as general partner *212 of a limited partnership. Prior to his service as general partner of Scarsdale 1982, and his related dealings with First Eastern, Pitkoff had no experience in the oil and gas industry. First Eastern was the placement agent for Scarsdale 1982. Permeator Corp. (Permeator) was the original contract driller. Kozelka, Palombo, Platz, Ed Reese (Reese), Steven Ridenour (Ridenour), David F. Bullock (Bullock), and Frederick E. Coveler (Coveler) were principals of Permeator. Permeator's geologists were John F. Sobehrad (Sobehrad) and Andrew A. Alff (Alff). Previous to its association with Scarsdale 1982, Permeator was a chemical company with no experience in the oil and gas industry. However, Kozelka, Palombo, and Platz, the principals of First Eastern, had been involved in the industry since 1981, by virtue of First Eastern's involvement in the industry at that time. At the time Scarsdale 1982 was created, Permeator was being sued for breaching drilling contracts with other entities. At that time, Permeator was not paying dividends, had no earnings per share, had generated net losses, and had a working capital deficit of $ 1,964,521 (on May 31, 1982). However, Permeator's Form 10-Q *213 shows more than $ 6 million in assets over liabilities in November 1981. Pitkoff testified that he was aware that Permeator had done well in the chemical business and was a public company selling on the NASDAQ exchange at "fairly decent prices". The record lacks any indication that Pitkoff undertook any additional investigation of Permeator. The purchase price of each unit of Scarsdale 1982 was $ 81,500, payable $ 21,500 in cash and $ 60,000 in three promissory notes, fully recourse on their face, each in the amount of $ 20,000 and due January 31, 1984, 1985, and 1986, respectively. The lease to be developed was subject to the landowner's and other overriding royalties aggregating 40 percent, including 7 percent of overriding royalties held by Permeator (or its affiliates) and 10 percent by First Eastern. [1]
*214 The Turnkey Agreement With Permeator
According to the turnkey agreement between Permeator and Scarsdale 1982, dated December 18, 1982, Permeator was to drill 18 wells for Scarsdale 1982 on a turnkey basis, at a cost of $ 125,000 per well. [2] The wells were to be commenced on or before December 31, 1982, and were to be completed with due diligence. On November 18, 1982, Permeator apparently guaranteed that the first three wells it drilled for Scarsdale 1982 would be "producing wells". However, that guarantee is not reflected in the December 18, 1982, turnkey agreement. Nowhere does either document define the term "producing well". At trial, Pitkoff described a producing well as a well that covers overhead and supplies income, producing at least five barrels of oil per day. Yet, petitioner now concedes that a producing well is merely one that produces hydrocarbons. Pitkoff testified at trial that such guarantee was sought and obtained due to Pitkoff's conversation with Mr. Ostrander of a company called Reomag, who purportedly advised him that the deal was too speculative unless accompanied by some additional assurance. [3]
*215 Accomplishments With Permeator As Driller
Investors in Scarsdale 1982 were informed that the general partner (Pitkoff) proposed to use the cash flow generated by the wells' production of oil to offset the limited partners' obligations under the promissory notes. However, no such cash flow was ever generated and at least half of the notes were not paid. Permeator did not commence any wells before December 31, 1982, never drilled any producing wells for Scarsdale 1982, and never assigned any drill sites to Scarsdale 1982. Petrowestern Takes Over As Driller
In early 1983, Permeator apparently was in severe financial difficulty. Its principals formed Petrowestern Corp. (Petrowestern), which took over Permeator's assets and liabilities, including the drilling contracts with Scarsdale 1982. On August 2, 1983, Petrowestern assigned three tracts from the Swigert lease (specifically tracts 13A, 14A, and 18B) (the Swigert tracts) to Scarsdale 1982. At about the same time, Petrowestern also assigned overriding royalty interests from the Swigert tracts to Bullock, Coveler, Platz, Palombo, and Kozelka (all principals of Permeator), Sobehrad and Alff (Permeator's geologists), *216 and Sasha Enterprises (Sasha, a partnership controlled by Pitkoff). On August 4, 1983, Petrowestern purportedly agreed that for each well paid for by Scarsdale 1982 at a turnkey price of $ 125,000, a producing well would be supplied. The guarantee did not define the term "producing well". Accomplishments With Petrowestern As Driller
Although the Swigert tracts generated about $ 250,000 of gross income over their life, that was not enough for them to "pay out". [4] By January 31, 1984, Scarsdale 1982 owed Petrowestern over $ 600,000, under the terms of the original turnkey agreement between Scarsdale 1982 and Permeator. Pitkoff did not enforce the limited partners' notes to meet that obligation. By July 1985, Petrowestern had drilled no more than six wells for Scarsdale 1982: Swigert #13A, Swigert #14A, Swigert #18, *217 Cavalier #1, Swigert #18A, and Hendershot #1. However, the latter three were dry wells. At trial, Pitkoff did not recall any of those three having been assigned to Scarsdale 1982. In 1985, Scarsdale 1982 abandoned the Swigert tracts. Through the time of trial in this case, Pitkoff has only sought enforcement of notes against two limited partners of Scarsdale 1982. During 1983, Scarsdale 1982 also had other problems with Petrowestern, including the nonissuance of insurance to cover Scarsdale 1982 and being billed for used equipment as new. Formation of Scarsdale 1983A
Scarsdale 1983A is a New York limited partnership organized in late 1983 with one general partner and 35 limited partners. Scarsdale 1983A is a calendar-year taxpayer using the accrual method of accounting for tax purposes. During 1983 and 1984, Pitkoff served as general partner for Scarsdale 1983A. As with Scarsdale 1982, First Eastern was the placement agent for Scarsdale 1983A. The economic track record of oil programs offered by First Eastern reflects only gross income as a percentage of cash and notes; no net income is shown. No First Eastern program described in the private placement memorandum *218 for Scarsdale 1983A yielded gross income exceeding 35 percent of the total cash and notes invested; many of the programs described therein had substantially less success than that. In January 1983, before the formation of Scarsdale 1983A, First Eastern, Permeator (the drilling contractor for Scarsdale 1982), and Kozelka (a principal of both First Eastern and Permeator) were sued in Federal court for violations of the registration and antifraud provisions of the Federal securities laws and common law. That information was known to Pitkoff and appeared in the private placement memorandum. Petro Global Corp. (Petro Global) was the contract driller for Scarsdale 1983A. Petro Global was a newly formed Texas corporation whose principals were Kozelka, Platz, Palombo, and Bullock. While Petro Global, per se, had no experience in the oil and gas industry, Palombo, Platz, and Kozelka were principals of First Eastern, which had been in the industry since 1981. At the time Scarsdale 1983A was formed, Petro Global's total liabilities exceeded its assets and its shareholders were without equity in the corporation. The purchase price for each unit of Scarsdale 1983A was $ 111,715, payable *219 $ 21,000 in cash and $ 90,715 by a promissory note, fully recourse on its face, with interest only payable at 14 percent, from December 1, 1983, through December 31, 1984, then in 48 amortized equal monthly payments of $ 2,478.93 each, from January 1985 to December 1988. The private placement memorandum describes the high risks and substantial tax benefits of investing in the program. The private placement memorandum explicitly requires all investors to have at least $ 200,000 in net worth and to be in at least the 49-percent tax bracket. Accordingly, the private placement memorandum demonstrates that a typical limited partner making a $ 20,000 cash investment (along with $ 90,715 in notes) could expect to save $ 33,288 in taxes, under the regular tax calculation, or $ 27,025 under the alternative minimum tax calculation. [5]
*220 The leases on which Scarsdale 1983A was to drill were subject to overriding royalties aggregating 30 percent, including 4 percent to Petro Terra Corp. (Petro Terra), 5 percent to Pitkoff, 6 percent to First Eastern, and 15 percent to Petro Global. After payout, Scarsdale 1983A was to assign an additional overriding royalty interest of 20 percent to Petro Global. Petro Terra was a newly formed New York corporation. whose function was to assign drill sites to Scarsdale 1983A. Petro Terra's principals were Kozelka, Palombo, and Platz. The Turnkey Agreement with Petro Global
The turnkey agreement between Petro Global and Scarsdale 1983A, executed on December 19, 1983, provided that Petro Global was to drill 26 wells for Scarsdale 1983A at a cost of $ 125,000 per well. [6] The agreement further provided that the wells be commenced and completed by December 31, 1985. On October 3, 1983, Petro Global purportedly agreed to supply Scarsdale 1983A with a producing well for each well purchased at a turnkey price of $ 125,000 per well. Neither the guarantee nor the turnkey agreement defines what the parties may have meant by a producing well. The private placement memorandum for *221 Scarsdale 1983A, prepared by Pitkoff, only contemplates the purchase of tangible equipment for 35 of the 52 wells drilled. [7]
The Accomplishments of Scarsdale 1983A
As in Scarsdale 1982, investors were informed that the general partner (Pitkoff) proposed to use the cash flow generated by the wells' production to offset the limited partners' obligations under the promissory notes. However, through 1988, no such cash flow was ever generated. Nevertheless, at least *222 half of the notes were never paid. [8]
The private placement memorandum contemplates the transfer of three leases located in Caldwell County, Texas, to Scarsdale 1983A: the Cape, the McMahon, and the Bellamy. However, none of those ever was transferred to Scarsdale 1983A. Pitkoff never even asked why those leases were not delivered. On December 19, 1983, Pitkoff, as general partner, executed an ostensibly recourse promissory note for $ 2,750,000 to Petro Global at an interest rate of 10 percent per annum, due and payable in its entirety on December 31, 1988. Upon joining Scarsdale 1983A, each limited partner executed an assumption of liability agreement in favor of Petro Global, whereby each agreed *223 to assume a pro rata share of the partnership's obligation to Petro Global. Pitkoff never assigned the assumption of liability agreements to Petro Global. Upon joining Scarsdale 1983A, each limited partner executed an assumption agreement and estoppel letter, acknowledging and consenting to the endorsement of its promissory notes as collateral for the extension of credit to the partnership. Pitkoff never assigned the assumption of liability agreement and estoppel letters. By July 3, 1985, Petro Global [9] had drilled no more than six wells for Scarsdale 1983A: the Buie, Nolte, Johnson, Fry, Wilson #3, and Wilson #4. Moreover, the Buie, Nolte, and Johnson wells were dry holes. On April 12, 1984, Petro Terra assigned 2.07 acres of the Fry lease to Scarsdale Associates. On April 16, 1984, Petro Terra assigned 2.07 acres of the Johnson lease to Scarsdale Associates. There is no record that Scarsdale 1983A was ever assigned the Nolte lease. On September 5, 1985, G & D Petroleum Co. assigned the Wilson #3 lease to Scarsdale 1983A. However, Pitkoff did not know of that assignment. *224 After July 3, 1985, Petro Global never assigned another lease to Scarsdale 1983A. Petro Global did not complete any producing wells for Scarsdale 1983A, except perhaps the Fry. On December 2, 1985, Permeator forfeited its right to conduct business in Texas. On July 28, 1986, Petrowestern forfeited its right to conduct business in Texas. On July 28, 1986, Petro Global forfeited its right to do business in Texas. Expert Testimony and Expert Opinion
The wells for Scarsdale 1983A were to be drilled on the Swift-Goodman Prospect, in the Lulling Branyon field, of the Austin Chalk, in Texas. The Lulling Branyon field is located in a shallow portion of the Austin Chalk. Between September 1930 and October 1954, seven dry holes had been drilled on the property. To successfully drill for oil it is necessary to have fractures. [10] However, fracturing alone is insufficient: to successfully drill for oil in the shallow part of the Austin Chalk, where the Swift-Goodman Prospect is located, there must also be structural closure. [11] Without closure, due to the porosity and permeability of the chalk, as well as the inherent lightness of oil, the oil would simply flow away. Consequently, *225 the presence or absence of structural closure would be of great interest to anyone wishing to drill for oil in the area. The private placement memorandum for Scarsdale 1983A does not include a structural closure map. Moreover, petitioner's expert, Mr. Sobehrad, did not prepare one. In fact, there was no structural closure in the area. According to one of respondent's experts, Mr. G. Warfield Hobbs, a prudent operator would not have drilled the leases which the program proposed to drill. Mr. Hobbs stated that the Lulling Branyon field, where the wells were to be drilled, was essentially depleted by the 1950's. According *226 to Mr. Hobbs, none of the 52 wells proposed to have been drilled would have been economically productive, meaning that investors could not reasonably have expected to cover their costs. Mr. Hobbs testified that the presence of a previously unaccounted-for guarantee that each well be productive would not alter his findings, since a well can be productive (at say one barrel per day) without being economic. The other expert witness testifying for respondent was James H. Hartsock. Mr. Hartsock stated in his report that "No rational decision maker familiar with the oil and gas business would consider drilling additional Austin Chalk wells in this area." Mr. Hartsock added that "The seven dry holes were sufficient to condemn the property for oil and gas production". Mr. Hartsock's report did not take into account the producing-well guarantees, but he stated at trial that this factor would not have altered his conclusions. The private placement memorandum for Scarsdale 1983A contains additional errors as well. Sobehrad's and Alff's geologist report, which appears in the private placement memorandum, is incorrect, insofar as it places the Swift-Goodman Prospect in the Buchanan field. *227 Moreover, Scarsdale 1983A's economic projections were based upon a price of $ 29 per barrel of oil, even though the private placement memorandum states that the expected sales price of oil would be $ 27.50 (before deducting $ 2.50 for the Windfall Profits Tax) and the average wellhead oil prices declined from $ 27.22 per barrel in January 1983 to $ 25.88 in December 1983. Scarsdale 1983A's economic projections were also incorrect in that the total note repayment interest (based upon enrollment of 84 limited partners) was understated by $ 747,909, due in part, perhaps, to the apparent use of a 13-percent interest rate, instead of the 14-percent interest rate described throughout the private placement memorandum. Further, Scarsdale 1983A's economic projections incorrectly calculated gross oil income on the basis of 52 wells completed, despite the fact that the funds allocated for tangible drilling costs were insufficient for even 35 wells. Scarsdale 1983A's private placement memorandum also contains an article, ostensibly by Daniel J. Fornari, on the specific geology of the Swift-Goodman Prospect of the Austin Chalk area of Texas. That article was used without Fornari's consent. *228 Moreover, the original article was altered: Fornari never reviewed geology of the Swift-Goodman Prospect, specifically, having written only a very general synthesis of the geology and petroleum geology of the Austin Chalk area of Texas. [12] Pitkoff never contacted, nor attempted to contact, Fornari to discuss the article. As noted, Sobehrad and Alff authored the geological report appearing in the private placement memorandum. Petitioner called neither Sobehrad nor Alff to testify at trial. Fees, Commissions, and Payments
On December 12, 1983, Scarsdale 1983A issued a check to Petro Global for $ 500,000, ostensibly for the purpose of drilling productive wells. [13] On December 19, 1983, Scarsdale 1983A issued a check to Pitkoff for $ 61,275, ostensibly as a general partner's fee. On December 19, 1983, Scarsdale 1983A issued a check to First Eastern for $ 42,900, ostensibly for consultations. On December 19, 1983, Scarsdale *229 1983A issued a check to Mark Gasarch, the tax consultant for the program, for $ 39,250, ostensibly as legal fees. On December 19, 1983, Scarsdale 1983A issued a check to First Eastern for $ 64,350, ostensibly as commissions. On January 5, 1984, First Eastern issued a check in the same amount to Sasha, a partnership controlled by Pitkoff. That payment represented Pitkoff's commission for placing clients in Scarsdale 1983A. On December 30, 1983, Scarsdale 1983A issued a check to Pitkoff for $ 2,142.75, ostensibly as general partner's fees. On December 30, 1983, Scarsdale 1983A issued a check to First Eastern for $ 2,250, ostensibly a payment for commissions. On December 30, 1983, Scarsdale 1983A issued a check to First Eastern for $ 1,500, ostensibly for consultations. On December 30, 1983, Scarsdale 1983A issued a check to Gasarch for $ 1,250. After the Commencement of the IRS Investigation
On February 20, 1985, *230 Revenue Agent Mel Bravo, of the Internal Revenue Service, first contacted Scarsdale 1983A regarding his audit of Scarsdale 1983A's tax returns for 1983 and 1984. In late 1985, Petrowestern submitted a program to Pitkoff for drilling gas wells with Petroleum Development Corp. (PDC) in West Virginia. That program never came to fruition. Pitkoff was ill for approximately the first 6 months of 1986, during which time Scarsdale 1983A was largely inactive. In 1987, Pitkoff hired Ron Williams as an oil and gas consultant. Williams was indicted for and pled guilty to tax fraud. By August 1988, Pitkoff was aware of Williams' conviction for tax fraud but continued to use him as a consultant. In approximately early 1987, Pitkoff combined the 1982 and 1983 partnerships into a single entity, Scarsdale Oil Associates -- Joint Venture (Scarsdale Joint Venture). [14] Scarsdale Joint Venture comprises 50 percent of the limited partners from Scarsdale 1982 and 50 percent of the limited partners from Scarsdale 1983A. Pitkoff testified that this new partnership was merely a "convenience factor" or agent for Scarsdale 1982 and Scarsdale 1983A. While we do not believe the actions of the joint venture *231 can be considered to be those of Scarsdale 1983A, the opposite conclusion would not affect the decision reached in this case. On March 6, 1987, Pitkoff wrote to the limited partners of both Scarsdale 1982 and Scarsdale 1983A, stating that if they did not continue with the drilling program and fund their notes, they would be subject to assessments from the Internal Revenue Service. In December 1987, Pitkoff announced, at an investors meeting, that he had signed *232 a drilling contract with American International Petroleum Corp. (AIP) to drill for gas and oil in Louisiana on behalf of Scarsdale Joint Venture. [15] At the meeting, Pitkoff told the limited partners that it was necessary to go forward with the program in order to avoid a disallowance of deductions for 1982 and 1983 (the cost of such disallowance estimated as being 80 percent of an investor's original investment, including the notes). The AIP drilling program did not come to fruition. In August 1988, at an investors meeting, Pitkoff discussed the Internal Revenue Service's issuance of a "60-day letter" to Scarsdale 1983A and his willingness to fight for any investor paying its note. At that meeting, Pitkoff also announced that he had signed a drilling contract with *233 Mid-States Energy (Mid-States) to drill for gas in Kentucky on behalf of Scarsdale Joint Venture. [16] However, after drilling approximately six or seven wells, Mid-States developed problems and it became necessary yet again to seek another driller. In September 1990, Scarsdale Joint Venture entered into a turnkey drilling contract with Republic Petroleum (Republic) to drill for gas in Kentucky. Litigation Over the Notes and the Wells
Petrowestern has sued Scarsdale 1982 to recover moneys due on promissory notes. Scarsdale 1982 is defending on the ground that the notes were not due until Petrowestern delivered wells. Petro Global has brought suit against Scarsdale 1983A to recover moneys due on the turnkey agreement. Scarsdale 1983A is defending on the ground that wells were *234 not delivered and that the delivery of wells by Petro Global is a condition precedent to Scarsdale 1983A's obligation to pay. In 1989, Petro Global moved for summary judgment against Scarsdale 1983A to recover the $ 2,750,000 promissory note. Scarsdale 1983A successfully defended, and the motion for summary judgment was denied, on the grounds that there were disputed issues of fact: viz, that the promissory note may not be an unconditional, independent obligation but possibly was contingent upon Petro Global's performance under the turnkey agreement, and, if so, would only be owing after the 26 wells had been delivered. The Court also noted that Petro Global delivered only one well, failing to even deliver all four wells for which it seems to have received repayment. OPINION Respondent offers various theories as to why the partnership items, either in their entirety or in part, ought to be disallowed. Respondent's arguments are as follows: (1) Scarsdale 1983A's oil and gas drilling transaction is a sham; (2) Scarsdale 1983A lacked a profit objective; (3) Scarsdale 1983A's recourse promissory note to Petro Global does not represent true indebtedness; (4) Scarsdale 1983A was protected *235 against loss on the partnership note to Petro Global within the meaning of section 465(b)(4); [17] (5) Scarsdale 1983A's expenditures were not incurred for the production of income; (6) Scarsdale 1983A is not qualified to make the election to deduct as an expense its alleged intangible drilling costs (IDC's); (7) Scarsdale 1983A is not entitled to deduct any IDC's pursuant to section 461; and (8) the losses and deductions claimed by Scarsdale 1983A would materially distort income. The argument respecting the partnership's profit objective, if resolved in favor of respondent, is sufficient to decide this case. Consequently, that argument will be addressed first; respondent's other arguments will be addressed thereafter, if necessary. Did Scarsdale 1983A Have a Profit Objective?
Section 183(a) provides that "if *236 * * * [an activity engaged in by an individual] is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." Section 183(b)(1) provides that certain deductions which do not depend upon a profit objective will be allowed. Section 183(b)(2) provides that deductions that do depend upon a profit objective will be allowed to the extent that gross income exceeds the deductions permitted under section 183(b)(1). Simply put, an individual must engage in an activity with the actual and honest objective of making a profit. Dreicer v. Commissioner, 78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). That requirement extends to activities carried out by way of a partnership. [18]
*237 The determination of whether an activity is engaged in for profit is to be made by reference to objective standards, taking into account all of the facts and circumstances of each case. Brannen v. Commissioner, 78 T.C. 471, 506 (1982), affd. 772 F.2d 695 (11th Cir. 1984); sec. 1.183-2(b), Income Tax Regs. The objective facts are to be accorded greater weight than the taxpayer's own statements of intent. Brannen v. Commissioner, supra at 506; sec. 1.183-2(a), Income Tax Regs.
The taxpayer's objective must be to achieve an economic profit independent of tax savings. Fox v. Commissioner, 82 T.C. 1001, 1021-1022 (1984). In the partnership context, that determination is made at the partnership level. Hulter v. Commissioner, 91 T.C. 371, 393 (1988); Brannen v. Commissioner, supra at 505 n.14. Specifically, we must look to those individuals running the partnership and whose expertise is relied upon in making partnership decisions. Hulter v. Commissioner, supra at 393; Fox v. Commissioner, 80 T.C. 972, 1007-1008 (1983), *238 affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner, 731 F.2d 230 (4th Cir. 1984) affd. without published opinions sub nom. Hook v. Commissioner, Kratsa v. Commissioner, Leffel v. Commissioner, Rosenblatt v. Commissioner, Zemel v. Commissioner, 734 F.2d 5, 6-7, 9 (3d Cir. 1984). Here our focus falls squarely upon Pitkoff, First Eastern, and the various related corporations (whose principals were largely the same as those of First Eastern) who, as general partner and promoters, were responsible for the affairs of Scarsdale 1983A. The burden is on petitioner to demonstrate that Scarsdale 1983A was engaged in the oil and gas exploration activity with the objective of earning a profit. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Section 1.183-2(b), Income Tax Regs., sets forth a nonexclusive list of factors to be considered in determining whether an activity is engaged in for profit. Those factors are as follows: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the *239 time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history or income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) the elements of personal pleasure or recreation. Each factor will be considered separately, with some overlap, except (4) and (9), which are not relevant to this case. A. The Manner in Which the Taxpayer Carries on the Activity
Perhaps the most important aspect of carrying on an activity is the decision to do so. Consequently, it is important to look first at the circumstances under which Scarsdale 1983A entered the oil and gas business. Highly relevant to this inquiry are the circumstances under which Pitkoff formed and operated Scarsdale 1982. [19]
*240 Scarsdale 1982
Pitkoff's Decision to Work With First Eastern
First Eastern's economic track record respecting oil programs reflected gross income, but no net income. As early as 1982, it was clear that no First Eastern program had yielded gross income exceeding 35 percent of the total cash and notes invested; other First Eastern programs enjoyed substantially less success than that. Yet, despite First Eastern's previous lack of success, Pitkoff chose First Eastern as the placement agent for Scarsdale 1982. The Selection of Permeator As Driller
Permeator had no prior experience in the oil or gas business, except insofar as three of its principals were principals of First Eastern, which had been in the business since 1981. Permeator had been sued for breaching its drilling contracts. Permeator paid no dividends, had no earnings per share, had net losses, and had a working capital deficit of nearly $ 2 million. In the face of those negative indications, Pitkoff's reasons for choosing Permeator are not convincing. Pitkoff stated at trial that the fact that Permeator was a public company traded on NASDAQ was, by itself, sufficient to give him a high degree of confidence *241 in the company. He also purportedly was impressed by Permeator's apparent $ 6 million in assets over liabilities. Neither of those factors speaks to its competence as a driller. The Purported Well Guarantee
At first blush, the presence of the guarantee, regardless of its meaning or scope, would seem to suggest that Scarsdale 1982 was acting prudently to secure a profit. However, additional considerations militate against such a conclusion. Most notable is the fact that Pitkoff never had a clear idea just what that guarantee entailed, except that every well delivered to Scarsdale 1982 was guaranteed to be a "producing well". Nowhere does any document define the term "producing well". Of course, that itself does not mean that Pitkoff did not have some understanding of the term: the term might be common knowledge to those in the oil and gas industry, including Pitkoff, such that the inclusion of a definition in the documents would be unnecessary. Nevertheless, Pitkoff's testimony at trial belies the conclusion that he understood what the guarantee meant. As noted earlier, Pitkoff described a "producing well" as one producing at least five barrels of oil a day. Yet, petitioner *242 (on brief) now concedes that a producing well is merely one that produces hydrocarbons. Thus, Pitkoff failed to understand his guarantee. Such ignorance hardly seems consistent with the behavior of a competent businessman seeking a profit. Absent some demonstration that his actions are attributable to a lack of competence, the inference is that the attainment of a profit for Scarsdale 1982 was, to Mr. Pitkoff, a matter of indifference. Investigation of the Oil and Gas Business
As noted earlier, Pitkoff visited the Texas oil fields, spoke with various First Eastern representatives, and read reports written or provided by First Eastern. Thus, Pitkoff relied solely upon the information and expertise provided by First Eastern to supplement whatever he, with no experience in the field, could discern without assistance. Clearly, the interests of First Eastern and Scarsdale 1982 were not identical: Pitkoff's willingness to accept First Eastern's representations on faith suggests indifference as to the truth of those representations. Such behavior seems inconsistent with a profit objective. Pitkoff's Efforts to Secure Wells for Scarsdale 1982 via Permeator
The turnkey agreement *243 with Permeator, dated December 18, 1982, called for 18 wells to be commenced by December 31, 1982. That agreement further provided that such wells were to be completed with "due diligence". Clearly, it was important, insofar as Scarsdale 1982 might have sought a profit, that these oil wells be delivered. Yet Permeator delivered no producing wells for Scarsdale 1982. Moreover, there is no indication in the record that Pitkoff even urged Permeator to live up to its bargain. Petitioner has failed to offer proof of any letters, phone conversations, conferences, or other evidence suggesting that Pitkoff tried to secure Permeator's performance -- or that he even was concerned about the matter. Pitkoff's Efforts to Secure Wells for Scarsdale 1982 via Petrowestern
In early 1983, Petrowestern took over Permeator's assets and liabilities, including the drilling contracts. Petrowestern, like Permeator, failed to live up to its obligations. By July 1985, Petrowestern had drilled no more than six wells for Scarsdale 1982, three of which were dry holes that had not, to Pitkoff's recollection, been assigned to Scarsdale 1982. [20] Petitioner has failed to offer evidence of any letters, *244 phone conversations, conferences, or other evidence suggesting that Pitkoff tried to secure Petrowestern's performance -- or that he even was concerned about the matter. The Limited Partners' Notes
By January 31, 1984, Scarsdale 1982 purportedly owed Petrowestern over $ 600,000. But Pitkoff did not enforce the limited partners' notes to meet that obligation. At present, he has only actively sought enforcement against two limited partners of Scarsdale 1982. Again, Pitkoff has demonstrated a lack of effort in acting on behalf of Scarsdale 1982. Scarsdale 1983A
Pitkoff's Decision to Work With First Eastern
In January 1983, before the formation of Scarsdale 1983A, First Eastern, Permeator, and Kozelka were sued in Federal court for violations of the registration and antifraud provisions of the Federal securities laws and for common law violations. *245 Moreover, First Eastern's economic track record respecting oil programs reflected gross income, but no net income, as it did at the time Scarsdale 1982 was formed. Since that time, it remained true that no First Eastern program had yielded gross income exceeding 35 percent of the total cash and notes invested and many of the programs had had substantially less success than that. Certainly Scarsdale 1982 cannot then have been considered a success. Yet, Pitkoff again chose First Eastern as the placement agent for Scarsdale 1983A. Such choice seems inconsistent with a profit objective. Pitkoff's Decision to Work With Petro Global
Equally inexplicable is the selection of Petro Global as contract driller. Petro Global had several of the same principals as Permeator, which had failed to live up to its obligations and which, as noted previously, had been sued for securities violations in Federal court. Moreover, Petro Global's liabilities exceeded its assets and its shareholders had no equity in the corporation. The selection of Petro Global as contract driller is difficult to reconcile with the asserted profit objective of Scarsdale 1983A. The Producing Well Guarantee
*246 On October 3, 1983, Petro Global apparently agreed to supply Scarsdale 1983A with a producing well at a turnkey price of $ 125,000 per well. The turnkey agreement, executed on December 19, 1983, provided that Petro Global was to drill 26 wells for Scarsdale 1983A. [21] Yet, nowhere in either document is the term "producing well" defined; and at trial Pitkoff offered a definition inconsistent with that now offered by petitioner on brief. Thus, as with Scarsdale 1982, Pitkoff obtained a guarantee without truly knowing what it meant, or if it meant anything. Again, such behavior hardly seems consistent with a profit objective. Pitkoff's Investigation of the Oil and Gas Business
As with Scarsdale 1982, Pitkoff conducted no independent *247 investigation as to the viability of the selected drill sites or into the prospects of the venture overall. Pitkoff relied upon Fornari's report without speaking with or attempting to contact Fornari. Overall, Pitkoff was apparently willing to take on faith the assertions of First Eastern, and First Eastern's experts Sobehrad and Alff, that this was a good deal. Books and Records
Pitkoff has offered no evidence of a fully executed partnership agreement, nor of any operating agreement for Petro Global to operate the wells subsequent to their completion. Moreover, Pitkoff never assigned the limited partners' promissory notes to Petro Global. He never assigned the limited partners' assumption of liability agreements to Petro Global. The inference is that Scarsdale 1983A was not carried out in a businesslike manner, nor with the objective to make a profit. B. The Expertise of the Taxpayer or His Advisors
Pitkoff admittedly had no experience in the oil or gas industry prior to his involvement with Scarsdale 1982. First Eastern had only been in the oil and gas business since 1981. Permeator, Petrowestern, and Petro Global all had essentially the same principals as *248 First Eastern, and the benefit of the same experience as First Eastern (minimal though it may have been). As was noted earlier, Pitkoff relied exclusively on First Eastern and its experts for expertise respecting the oil and gas industry. See supra p. 29. Pitkoff relied on the Fornari report without ever talking with or attempting to contact Fornari. Pitkoff also relied on the report by Sobehrad and Alff, a report which lacks merit: Sobehrad never prepared a structural closure map, despite the clear importance of doing so; Sobehrad and Alff seemingly ignored the presence of seven dry holes. Moreover, Sobehrad's report erroneously placed Scarsdale 1983A's contemplated drill sites in the Buchanan field, an area known for closure. At trial respondent produced two experts who testified that on the basis of the information available at the time, one could not reasonably have expected a profit from the drilling activities undertaken by the partnership. [22] At trial, petitioner offered no expert testimony in opposition. Thus, respondent's expert testimony is evidence that the expertise of Pitkoff and his advisers was inadequate.
*249 In addition, Pitkoff's private placement memorandum for Scarsdale 1983A contained basic errors. The private placement memorandum computed revenues based upon an oil price of $ 29 per barrel, although it is clearly stated therein that the expected sales price of oil would be $ 27.50 (before deducting the Windfall Profits Tax) and the average wellhead oil price declined from $ 27.22 per barrel in January 1983 to $ 25.88 in December 1983. Moreover, the note repayment interest was understated by $ 747,909. The presence of those basic errors suggests that the level of expertise, as well as effort, of Pitkoff and his advisers was quite low. Pitkoff's purported discussions with a Mr. Ostrander of Reomag also fail to demonstrate a high level of expertise having been sought or obtained. At most, those discussions prompted Pitkoff to obtain from the various drillers a guarantee of "producing wells" that he clearly did not understand but nonetheless found satisfactory. In addition, the alleged expert listed by Scarsdale 1983A's private placement memorandum is Mark Gasarch, Esq., a tax consultant. Gasarch wrote the tax opinion. No oil or gas authorities were listed as experts. Overall, *250 the inadequate level of expertise demonstrated by Pitkoff, and the people upon whom he relied, suggests the absence of a profit objective. C. The Time and Effort Expended by the Taxpayer in Carrying on the Activity
Before the IRS Audit Began
The record lacks substantial evidence that Pitkoff expended any substantial time or energy in carrying out his duties as general partner of Scarsdale 1983A before February 1985, when the Internal Revenue Service audit began. [23] Pitkoff's efforts during this period consisted primarily of entering into the turnkey agreement with Petro Global and then sitting idly by while such contract was ignored, while few wells were drilled, and fewer were assigned to Scarsdale 1983A -- which was far short of the 26 wells contemplated by Scarsdale 1983A's turnkey agreement with Petro Global. There is no indication that Pitkoff questioned *251 Petro Global's performance. No evidence of correspondence, phone conversations, or conferences was presented at trial. Simply put, Scarsdale 1983A was going nowhere during this period, because Petro Global was not fulfilling its obligations, and there is no indication that Pitkoff took any action or even was concerned. After the IRS Audit Began
As outlined earlier, shortly after the commencement of the audit by the Internal Revenue Service, Pitkoff began visiting Virginia, Louisiana, and Kentucky. [24] Pitkoff even entered into turnkey agreements with drillers. Clearly, at that time, Pitkoff was devoting substantial time and energy in carrying out the activity of Scarsdale 1983A. Petitioner contends that those efforts evince a profit objective respecting the years at issue. Respondent contends that those efforts are irrelevant. We are unable to agree with either party. Pitkoff's greatly increased efforts, subsequent to the tax audit, lead to the conclusion that, before such time, Pitkoff was not trying to earn a profit for Scarsdale 1983A. [25]
*252 D. The Success of the Taxpayer in Carrying on Other Similar or Dissimilar Activities
Similar Activities
Section 1.183-2(b)(5), Income Tax Regs., states: "The fact that the taxpayer has engaged in similar activities in the past and converted them from unprofitable to profitable enterprises may indicate that he is engaged in the present activity for profit, even though the activity is presently unprofitable." Similarly, the fact that Pitkoff has previously engaged in a similar activity, Scarsdale 1982, and neither made a profit nor demonstrated any interest in so doing, permits an inference that Pitkoff was indifferent to the prospect of achieving a profit for Scarsdale 1983A. We have already outlined the failures of Scarsdale 1982, and Pitkoff's apparent indifference thereto, and will not repeat that discussion here. It suffices to recap by observing that Scarsdale 1982 never made a net profit, never paid back its limited partners' cash investments, and never drilled anywhere close to the required number of wells. As noted, Pitkoff took little or no action to alter that course of events. Dissimilar Activities
Mr. Pitkoff also placed a number of clients in an *253 investment known as the "Beefalo Program" in a 1977. [26] The program did not earn an economic profit. Some investors received tax deductions; those whose deductions were disallowed received some compensation from the promoter. Mr. Pitkoff also placed clients in other investments and there is no indication that any of those earned an economic profit either. E. The Taxpayer's History of Income or Losses With Respect to the Activity
Scarsdale 1983A has yet to profit from its oil and gas activities: only in 1989 has Scarsdale 1983A had any taxable income, and that amount was insubstantial. Moreover, a profit achieved in 1989 may not be indicative of a profit objective for the years here at issue. Overall, the income earned by Scarsdale 1983A is insignificant in relation to the costs incurred. Of course "A series of losses during the initial or start-up stage of an activity may not necessarily be an indication that the activity *254 is not engaged in for profit." Sec. 1.183-2(b)(6), Income Tax Regs. But, petitioner here introduced no evidence suggesting that the partnership's substantial and consistent losses were incurred within "the period which customarily is necessary to bring the operation to profitable status" or that the losses are due to unforseen or fortuitous circumstances beyond taxpayer's control. See sec. 1.183-2(b)(6), Income Tax Regs. Consequently, the inference is that there was no profit objective. F. The Amount of Occasional Profits, If Any, Which Are Earned
Section 1.183-2(b)(7), Income Tax Regs., suggests that an occasional or unlikely profit will be sufficient basis from which to infer a profit objective, provided the potential, albeit unlikely, profit is of sufficient magnitude. In this case, however, the profits were both inconsequential and infrequent: only in 1989 did Scarsdale 1983A produce taxable income. Nor does it appear, from the information then available, that there was a legitimate possibility of earning sufficient ultimate profit to justify the long odds of achieving any profit whatsoever. See sec. 1.183-2(b)(7), Income Tax Regs. Thus, the inference is that there *255 was no profit objective. G. The Financial Status of the Taxpayer
"Substantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit". Sec. 1.183-2(b)(8), Income Tax Regs.
This factor clearly weighs against the existence of a profit objective. As a precondition of their investment, all of Scarsdale 1983A's limited partners were required to have net worths of over $ 200,000. Moreover, the private-placement memorandum requires all investors to be in the 49-percent tax bracket or higher, thereby guaranteeing that they have substantial income as well. In return for the $ 20,000 cash investment, an investor in the 50-percent tax bracket could expect to save $ 33,288 in taxes under the regular tax calculation, or $ 27,025 in taxes under the alternative minimum tax. Thus, an investor would come out $ 7,025 to $ 13,288 ahead, even if no oil or gas were ever drilled. [27] This factor suggests the absence of a profit objective. *256 Conclusion
Overall, it is clear that Scarsdale 1983A lacked a profit objective. Consequently, respondent properly disallowed all of the deductions at issue in this case. Sec. 183; Golanty v. Commissioner, 72 T.C. 411 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). Thus, respondent's other arguments need not be addressed. Decision will be entered for respondent. Footnotes
1. An overriding royalty is an interest in the oil or gas produced pursuant to a specified oil and gas lease or leases or the proceeds from the sale thereof, received free and clear of all costs of development, operations, and maintenance.↩
2. A turnkey agreement is a drilling contract that calls for the payment of a stipulated amount to the drilling contractor for drilling a well to a specified depth. ↩
3. Beyond Pitkoff's testimony, there is no evidence that such conversation actually took place, or that a company called Reomag even exists.↩
4. "Payout" is defined as the point at which revenues, less royalty burdens, severance taxes, and operating costs, from a well, or group of wells, or program, first equals total investment cost.↩
5. Actually, the total cash investment, as outlined above, is $ 21,000. However, $ 1,000 of this amount is described as allocated toward legal costs and is apparently not considered a cost of the limited partnership unit, specifically.↩
6. Of the $ 125,000 per well, $ 120,000 was to be allocated for intangible drilling costs and $ 5,000 for the acquisition of the drill site. Miracle Enterprises was to purchase tangible equipment for Scarsdale 1983A. Pitkoff was the founder of Miracle Enterprises, and its principal. Upon entering Scarsdale 1983A, the limited partners acknowledged, in the subscription agreement to Scarsdale 1983A, that Pitkoff may have had a conflict of interest in recommending Scarsdale 1983A. ↩
7. Yet, gross income was calculated on the basis of 52 wells completed.↩
8. Petitioner asserts that half the investors have paid off their notes. We understand that to constitute a concession that no more than half have done so. However, petitioner has offered no proof on the matter. Therefore, it is an open issue as to how many investors, up to one half, may have paid off their notes.↩
9. Some of the documents in evidence suggest that Petrowestern, as opposed to Petro Global, provided various leases to Scarsdale 1983A. However, the parties did not always clearly distinguish the different drillers from one another and we believe that such documents demonstrate a transfer from Petro Global to Scarsdale 1983A.↩
10. A fracture is a crack in solid rock caused by natural faulting or flexuring of geological strata, or by artificial stimulation of the strata by hydraulic fracturing, along which no horizontal or vertical movement has occurred. ↩
11. A structural closure is a trap for an oil accumulation formed by the "closure" of subsurface elevation contours to form a dome, or closure of contours against a fault.↩
12. The Austin Chalk is a vast formation extending from one side of Texas to the other.↩
13. At a turnkey price of $ 125,000 per well, this payment represented payment for four wells.↩
14. Insofar as many dealings and documents after March 1987 refer, somewhat ambiguously, to "Scarsdale Oil Associates", it is difficult to determine whether Scarsdale 1983A is implicated thereby. But, in light of the apparent substitution of Scarsdale Joint Venture for the 1982 and 1983 partnerships, we have treated ambiguous dealings and documents as involving the Scarsdale Joint Venture. Whether the dealings of Scarsdale Joint Venture are necessarily relevant to the potential profit objective of Scarsdale 1983A is a separate question we will deal with later.↩
15. The AIP drilling contract called for the drilling of 22 wells at a turnkey price of $ 227,000 per well, of which $ 57,000 was to be paid to Mega Oil & Gas Company, Inc. (Mega). David Pitkoff, the son of Bernard Pitkoff, is the president of Mega.↩
16. The Mid-States drilling contract called for the drilling of up to 30 wells at a turnkey price of $ 225,000 per well, of which $ 50,000 was to be paid to Delta Oil & Gas Corporation (Delta). David Pitkoff is the president of Delta.↩
17. Unless otherwise noted, all section references are to the Internal Revenue Code of 1954 in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
18. While sec. 183, on its face, would seem applicable only to individuals or S corporations, it is undisputed that the requirement of a profit objective applies to a partnership, in which an individual is a member, as well. See Hulter v. Commissioner, 91 T.C. 371, 392 (1988); Brannen v. Commissioner, 78 T.C. 471, 505 (1982), affd. 772 F.2d 695↩ (11th Cir. 1984).
19. As noted earlier, the focus is mostly upon Pitkoff, who was general partner of Scarsdale 1983A, and also somewhat upon First Eastern and its related corporations. Hulter v. Commissioner, supra; Fox v. Commissioner, 82 T.C. 1001↩ (1984).
20. As noted earlier, other problems with Petrowestern included the nonissuance of insurance to cover Scarsdale 1982 and being billed for used equipment as new.↩
21. Interestingly, the purported guarantee is not reflected in the turnkey agreement, suggesting that perhaps such guarantee did not exist at the time the parties entered into the turnkey agreement, even though the purported guarantee, on its face, is dated more than 2 months earlier.↩
22. Petitioner points out, quite correctly, that a reasonable profit expectation is not required. Golanty v. Commissioner, 72 T.C. 411, 425-426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); sec. 1.183-2(a), Income Tax Regs.↩ However, the activity must have been entered into, or continued, with the objective of making a profit.
23. Nor is there any indication that Pitkoff hired competent and qualified persons to do so on his behalf. See sec. 1.183-2(b)(3), Income Tax Regs.↩
24. Pitkoff asserts that certain negotiations or investigations began before the IRS audit, late in 1984, but offers no evidence to support that contention. Thus, petitioner does not satisfy his burden of proof. Rule 142(a). ↩
25. We point out that the sudden increase in effort is distinguishable from the "change of operating method" or "adoption of new techniques" contemplated by sec. 1.183-2(b)(1), Income Tax Regs. The latter may warrant an inference of increasing proficiency↩, which may suggest a continuously held profit objective; the former does not.
26. The Beefalo Program involved an attempt to crossbreed the buffalo with the cow.↩
27. Obviously, that after-tax profit is dependent upon the notes' (totaling $ 90,715 per $ 20,000 cash investment) never being paid. As noted earlier, at least half (and possibly more) of the notes have not been paid and petitioner has not demonstrated that there was ever any reasonable expectation that investors would ultimately be required to do so. Certainly, Pitkoff's failure to assign the limited partners' promissory notes and assumption agreements belies any such conclusion, as does Petro Global's lack of effort to fulfill its obligations under the turnkey agreement. Moreover, Pitkoff's failure to enforce notes from the 1982 program (with the exception of two investors against whom Pitkoff is currently litigating) suggests that the notes respecting the Scarsdale 1983A program were not meant to be enforced.↩